## BEFORE THE UNITED STATES
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE: HAIR RELAXER PRODUCTS    )
LIABILITY LITIGATION            )    **MDL Docket No.: 3060**
                                 )

### INTERESTED PARTY RESPONSE OF PLAINTIFFS JACKIE BROWNLEE, TERESA SPENCER, MICHELLE WRAY, SHAWNETTE HANSON, JENNIFER JEFFERSON-BEARD, KRYSTAL SANDERS AND VICTORIA SHAW TO THE MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED AND CONSOLIDATED PRETRIAL PROCEEDINGS

Plaintiffs Jackie Brownlee, Teresa Spencer, Michelle Wray, Shawnette Hanson, Jennifer Jefferson-Beard, Krystal Sanders and Victoria Shaw ("Plaintiffs") submit this Interested Party Response to the Motion for Transfer of Actions Pursuant to 28 U.S.C.§ 1407 for Coordinated or Consolidated Pretrial Proceedings filed by Plaintiffs Jenny Mitchell, Rugieyatu Bhonopha, Diane Grant, and Bernadette Gordon ("Movants") [Doc.1].

## I.     PRELIMINARY STATEMENT

Your undersigned's law firm represents seven Plaintiffs who have nearly identical personal injury actions pending in four federal district courts – the United States District Courts for the Southern District of Ohio, the Eastern District of New York, the Northern District of Illinois, and the Southern District of New York[1] – and who are seeking recovery against Defendants because they were caused to suffer injuries to their reproductive systems (i.e. uterine cancer, endometrial cancer and/or uterine fibroids) as a result of Defendants' Hair Relaxer products.

Including your undersigned's seven actions, we are aware of a total of 33 substantially similar actions that have been filed in 13 different federal courts across the country (the "Hair Relaxer Actions"), from 19 different law firms, and it is anticipated that the number of filed cases will continue to increase, ultimately likely being well over a thousand cases.

Given the overlapping facts and issues involved in these cases, as well as the increasing volume of actions, Plaintiffs submit that transfer and centralization of all Hair Relaxer Actions into one multidistrict litigation ("MDL") pursuant to 28 U.S.C. § 1407 is warranted. A MDL would be the most efficient and most appropriate course of action for the Panel because it would: (1) promote just and efficient conduct of these actions; (2) prevent inconsistent pretrial rulings and duplicative discovery; and (3) conserve resources of the parties and judiciary.

---

[1] We also represent and continue to investigate claims on behalf of hundreds of individuals who allege injuries were due to Defendants' Hair Relaxers.

## II.  FACTUAL CLAIMS ABOUT HAIR RELAXERS

Since as early as 1971, Defendants have manufactured and marketed Hair Relaxer products.  Today, Defendants continue to market their Hair Relaxers to customers across the United States, and the world, particularly focusing on Black and Brown women to "tame" their ethnic hair, reinforcing historical Eurocentric standards of beauty. To this end, Defendants' marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.[2]  Studies have reported that up to 90% of Black and Brown women have used Hair Relaxers, which is more commonplace for these women than for any other race.  Defendants' Hair Relaxers can be used by professional cosmetologists in salons or barbershops, or at home by consumers with over-the-counter kits designed for individual use.

The plaintiffs in the Hair Relaxer actions allege they have suffered and/or continue to suffer certain reproductive system injuries from their use of Defendants' Hair Relaxers, and their allegations are supported by recent studies that have implicated certain chemical components of Hair Relaxers as potential contributors to, among other things, increased reproductive cancer incidence and uterine fibroids ("reproductive system injuries").[3]

Notably, the hormonally active and carcinogenic compounds of Hair Relaxers are not listed separately as ingredients on their labels but instead are often broadly lumped into the "fragrance"

---

[2]  Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017. Available at: https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.

[3] These constituents include metals, formaldehyde, and multiple endocrine-disrupting chemicals such as phthalates, parabens, bisphenol A ("BPA"), cyclosiloxanes, and diethanolamine. Chang C-J, et al. *Use of Straighteners and Other Hair Products and Incidence Uterine Cancer*. JNCI J Natl Cancer Inst. 2022:00(0). Available at: https://doi.org/10.1093/jnci/djac165.; White A.J., et al. *Use of hair products in relation to ovarian cancer risk.* Carcinogenesis 2021;42(9):1189-1195. Available at: https://doi.org/10.1093/carcin/bgab056; Coogan P.F., et al. *Hair product use and breast cancer incidence in the Black Women's Health Study*. Carcinogenesis 2021;42(7):924-930. DOI:10.1093/carcin/bgab041; Gaston S.A., et al. *Chemical/Straightening and Other Hair Product Usage during Childhood, Adolescence, and Adulthood among African-American Women: Potential Implications for Health*. J. Expo. Sci. Environ. Epidemiol. 2020;30(1):86-96. doi:10.1038/s41370-019-0186-6; Zota A.R., Shamasunder B. *The environmental injustice of beauty: framing chemical exposures from beauty products as a health disparities concern*. Am. J. Obstet. Oct. 2017;418-422.

or "perfume" categories. Yet, these non-identified endocrine-disrupting chemicals ("EDCs") interfere with the normal activity of the endocrine system and have been linked to numerous adverse human health outcomes, including various cancers,[4] and specifically have the potential to cause formation of several hormone-dependent cancers, including ovarian cancer.[5]

Most recently, in October 2022, the Sister Study – a large, diverse, ongoing prospective cohort study conducted by the National Institute of Environmental Health Sciences (NIEHS), one of the National Institutes of Health (NIH) – reported results that revealed that women who used Hair Relaxers had a higher risk of uterine cancer[6]. Importantly, the researchers found no such association with other hair products used by those women, including hair dye, bleach, highlights, or perms.[7] The researchers concluded that women who reported frequent use of Hair Relaxers (i.e., more than four times in the previous year) were more than twice as likely to develop uterine cancer compared to those who did not use the products.[8]

Another recent publication from the researchers of the Sister Study found the risk of ovarian cancer approximately doubled with frequent use (defined as greater than four times per year) of Hair Relaxers in the previous year as opposed to never use (HR = 2.19).[9] Further, the

---

[4] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain% 20cancers%2C%20respiratory%20problems%2C

[5] Lee H. M., et al. *Diverse pathways of epithelial mesenchymal transition related with cancer progression and metastasis and potential effects of endocrine disrupting chemicals on epithelial mesenchymal transition process*. Mol Cell Endocrinol 2017;457:103-113, doi:10.1016/j.mce.2016.12.026.

[6] Uterine cancer cases were defined as women who reported a diagnosis of endometrial cancer, uterine sarcoma, or other types of cancer in the uterus after enrollment.

[7] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/

[8] *Id*. Specifically, in ever vs. never users the HR = 1.80 [1.12-2.88]; for frequent vs. never users the HR = 2.55 [1.46-4.45]. The researchers estimated that 1.64% of women who did not use the products would develop uterine cancer by age 70, compared to 2.82% of ever users and 4.05% of frequent users.

[9] White A.J., et al. *Use of hair products in relation to ovarian cancer risk*. Carcinogenesis 2021;42(9):1189-1195.

researchers noted that "given the much higher prevalence of use of these products, the impact of these results is more relevant for African American/Black women."[10] [11]

Plaintiffs' claims relate to the Hair Relaxers' carcinogenic and endocrine-disrupting nature (as it appears do all other plaintiffs' claims), which they allege, at all relevant times, was known and/or should have been known by Defendants.[12]

## III.    ARGUMENT

### A.    MULTIDISTRICT CENTRALIZATION IS APPROPRIATE FOR THESE CASES

#### 1. Consolidation is Warranted Under 28 U.S.C. § 1407

Under 28 U.S.C. § 1407, the Panel *may* consolidate numerous cases if the moving party sufficiently demonstrates that (1) the lawsuits contain common questions of fact, (2) consolidation would best serve the convenience of the parties and witnesses, and (3) consolidation promotes just and efficient conduct of such actions. *See* 28 U.S.C. § 1407. Here, Plaintiffs respectfully submit that the Hair Relaxer Actions meet these statutory requisites and therefore centralization is warranted.

First, each of the related Hair Relaxer actions allege substantially similar causes of action and contain the same allegations about Hair Relaxers and their propensity to cause serious

---

[10] *Id.*

[11] A 2012 study in the *American Journal of Epidemiology* associated uterine fibroid risk with the use of Hair Relaxers. In the Black Women's Health Study, the authors assessed Hair Relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on Hair Relaxer use (*i.e.*, age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The authors noted that the incidence of uterine leiomyomata was two to three times higher in US Black women than in US white women, with the lifetime risk estimated to be 80% in US Black women. The study showed positive trends for frequency of use, duration of use, and number of burns: "Among long-term users (≥10 years), the incidence rate ratios for frequency of use categories 3-4, 5-6, and ≥7 versus 1-2 times/year were 1.04 […], 1.12 […], and 1.15 […], respectively."

[12] Under the current regulatory framework in the United States, including the Federal Food Drug and Cosmetic Act and the Fair Packaging and Labeling Act, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and risks of their products, and to warn consumers anytime a health hazard may be associated with their products. Here, a wealth of peer-reviewed, scientific information is available regarding long-term use of Hair Relaxers as containing certain EDCs, which should have alerted these manufacturers to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

reproductive system injuries, including uterine and ovarian cancers as well as fibroids. All of these actions, as well as future actions, are based upon the same or substantially similar underlying facts:

- Hair Relaxers, as a class, can cause reproductive system injuries as supported by, among other things, the aforementioned scientific studies;

- Defendants negligently created, designed, researched, developed, manufactured, tested, marketed, advertised, promoted, distributed and sold Hair Relaxer Products to the public, including all plaintiffs in their respective actions;

- Defendants knew or should have known of the dangers and defects associated with Hair Relaxers;

- Defendants failed to warn the of the dangers and defects associated with Hair Relaxers; and

- All plaintiffs suffered grave reproductive system injuries as a result of using Defendants' defective Hair Relaxers.

Clearly, the defects and increased risks and/or side effects associated with Defendants' Hair Relaxer Products will be central issues to all of these matters, especially given that Plaintiffs rely upon the same studies to support their claims. *In re Acetaminophen - Asd/Adhd Prods. Liab. Litig.,* 2022 U.S. Dist. LEXIS 183759, **2-3 (J.P.M.L. Oct. 5, 2022)(consolidating actions against multiple defendants where general causation, background science and regulatory history would be substantially the same in all actions); *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.,* 176 F. Supp. 3d 1377, 1378 (J.P.M.L. Ap. 7, 2016)(consolidating actions where all of them relied principally on the same studies to support their shared allegations on causation); *In re Androgel Prods. Liab. Litig.*, 24 F.Supp.3d 1378, 1379 (J.P.M.L. 2014)(same).

In response to these common allegations, Defendants will likely deny, as they do in their respective Oppositions, that their Hair Relaxers can cause these reproductive system injuries, and they will likely oppose and offer alternative explanations regarding plaintiffs' allegations, the defective warnings, and, of course, Defendants' conduct. Yet, these defenses, just like plaintiffs' allegations, involve common questions of facts that overlap, thus, supporting centralization.

And it is this these overlapping common areas of fact, as well as many others, that support the second, and arguably most important, reason why centralization is appropriate here – to prevent inconsistent judicial rulings, eliminate duplicative discovery, and conserve the resources of the judiciary, the parties and their counsel. *See, e.g.*, *see also In re MLR, LLC, Patent Litig.*, 269 F.Supp.2d 1380, 1381 (J.P.M.L. 2003) (noting that consolidation before a single transferee judge allows for consideration of "all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions."); *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 330 F.Supp.3d 1378, 1379 (J.P.M.L. 2016).

Because recent scientific findings support that reproductive system injuries are caused by Hair Relaxers as a class, discovery as to all Defendants will inevitably overlap, especially as it applies to the scientific data that links Hair Relaxer use to the alleged injuries. To this end, expert witness opinions on causation and *Daubert*-related challenges will likely overlap as to all Defendants. It is simply more efficient to allow one Court to become familiar with the underlying science and to issue consistent rulings. *See In re Natrol, Inc.*, 26 F. Supp. 3d 1392, 1393 (consolidating actions where there were shared complex scientific issues concerning product ingredients that would be litigated, where the same clinical studies would be challenged and where common expert discovery and *Daubert* hearings would overlap); *see also In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.,* 176 F. Supp. 3d at 1378.

Third, as noted above, the need for centralization is evidenced by the fact that there are already 33 similar Hair Relaxer actions on file in 13 district courts around the country, with more cases coming, all of which will ultimately result in separate scheduling orders and many other duplicative pretrial practices being conducted, should a MDL not be created.

## 2. **Industry-wide MDLs are Not Uncommon**

In the past, the Panel has not shied away from consolidating industry-wide MDLs, such as the one sought here, where consolidation would potentially reduce costly duplicative discovery as well as the potential for inconsistent judicial rulings, especially on such matters as *Daubert* rulings. *In re Androgel Prods. Liab. Litig.*, 24 F.Supp.3d at 1379 (creating an industry-wide MDL despite differing manufacturers because centralization would reduce potentially costly expert discovery, facilitate the establishment of a uniform pretrial approach to these cases, reduce the potential for inconsistent rulings on such matters as *Daubert* rulings, and conserve the resources of the parties, their counsel, and the judiciary."); *In re Incretin Mimetics Prods. Liab. Litig.,* 968 F. Supp. 2d 1345, 1346 (J.P.M.L. 2013)(granting consolidation of various diabetic drug actions into one MDL because discovery would involve many of the same or substantially similar documents and witnesses and centralization would eliminate duplicative discovery and prevent inconsistent pretrial rulings (particularly on such matters as *Daubert* rulings)).[13]

It is also worth noting that many plaintiffs used more than one Hair Relaxer product, and this factor is a "practical consideration" further warranting the creation of an industry-wide MDL. *In re Valsartan N-Nitrosodimethylamine Ndma Contamination Prods. Liab. Litig.*, 363 F. Supp. 3d 1378, 1382, n.8 (practical considerations warranting centralization included that most

---

[13] *See also In re Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 3d 1378, 1380 (J.P.M.L. 2015) (centralizing 20 actions in an industry-wide MDL because all actions, regardless of the manufacturer, would share factual questions regarding general causation, the background science, and common regulatory issues); *In re Gadolinium Contrast Dyes Prods. Liab. Litig.,* 536 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008)(consolidating actions against five defendants because they involved common facts relating to causation despite the existence of differing product designs); *In Re Walgreens Herbal Supplements Mktg. and Sales Practices Litig.,* 2015 U.S. Dist. LEXIS 75045 (J.P.M.L. 2015)(finding MDL consolidation appropriate to resolve the defendants' common challenges to the validity of the New York attorney generals' investigation and underlying testing data, and to address the common discovery regarding said investigation and data); *In re: Silicone Gel Breast Implant Litig.*, 793 F. Supp. 1098 (J.P.M.L. 1992)(holding that common questions exist as long as the different manufacturers all designed similar defective products); *In re Chinese Manufactured Drywall Prods. Liab. Litig.,* 626 F.Supp.2d 1346 (J.P.M.L. 2009)(same); *In Re Orthopedic Bone Screw Prods. Liab. Litig.,* MDL No. 1014 (same).

consumers were dispensed more than one manufacturer's products); *see also In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 261 F. Supp. 3d 1351 (J.P.M.L. Aug. 2, 2017)(noting "mixed use" cases added support for consolidation of an industry-wide MDL involving multiple defendants).

As to the management of a MDL with multiple manufacturers and products, such as this, this is not a novel concept, and has been successfully done with many MDLs, including most recently the massive *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* (MDL-2873), and *In Re: National Prescription Opiate Litigation* (MDL-2804) MDLs, to name a few. Indeed, any of the numerous courts that have overseen industry-wide MDLs, and any Court ultimately assigned to oversee this MDL, have the power to "employ any number of pretrial techniques – such as establishing separate discovery and/or motion tracks for each [product at issue] and/or separate tracks for the different types of actions involved – to efficiently manage the litigation." *In Re Janus Mut. Funds Inv. Litig.,* 310 F.Supp.2d at 1361; *In Re Androgel Prods. Liab. Litig.*, 24 F.Supp.3d at 1379-1380. In short, case management of this matter should not be an obstacle to centralization.

### 3. **Defendants' Arguments Are Unpersuasive**

Defendants' argument against consolidation on the grounds that there are multiple manufacturers and multiple products is not a reason to deny creation of this MDL. As set forth above, the Panel has repeatedly found centralization to be appropriate where there are multiple defendants and similar, not even identical, products at issue so long as there are common factual questions such as causation, science, testing and regulatory issues. *Supra*. Despite arguments otherwise, the fact that these Defendants are competitors is not an obstacle to centralization because their confidential information can be protected by protocols imposed by the MDL judge just as a single judge would do if he/she was overseeing a single multi-defendant case. *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 183703,

*4-5 (J.P.M.L. Oct. 6, 2022)(finding unpersuasive an argument that protecting trade secrets would complicate centralized proceedings because one-quarter of the pending actions were multi-defendant actions and protecting defendants' trade secrets and confidential information would be at issue regardless of whether these cases are included in the MDL).

Defendants' arguments that these cases involve individual facts should likewise also be rejected. While individual facts will inevitably vary, as in all personal injury, products liability cases, such does not weigh against centralization. To the contrary, the Panel typically orders the transfer of such cases. *See In re: Eliquis (Apixaban) Prods. Liab. Litig*., 2017 WL 6569794, at *2 (J.P.M.L. May 30, 2017)("transfer does not require a complete identity of parties or factual issues when, as here, the actions arise from a common factual core".); *see also In re: Roundup Prods. Liab. Litig*., 214 F. Supp. 1346, 1347 (J.P.M.L. 2016)("differences are not an impediment to centralization when common questions of fact are multiple and complex."); *see also, In re: Tylenol (Acetaminophen) Marketing, Sales Practices & Prods. Liab. Litig*., 936 F. Supp. 2d 1379 (J.P.M.L. 2013)(same). The above are just three examples of many where the Panel has centralized large scale products liability cases and rejected "individual facts" arguments such as those being advanced here.

The undeniable truth here is that centralization is necessary because there are already a number of substantially similar and related actions pending in different district courts. Undoubtedly, the number of cases on file will continue to grow, which, if a MDL is not created, will ultimately result in a multitude of different scheduling orders, conflicting dispositive rulings as well as disparate rulings on foundational case management orders like protective orders, ESI protocols, etc.

### 4. **Informal Coordination Is Not a Practical Alternative**

Your undersigned submits that it is overwhelmingly preferable for disputes regarding substantially similar and/or identical discovery issues as well as foundational case management and motion practice to be resolved by a single court, even when a handful of different products and a few different defendants are involved. Without MDL centralization, these actions will remain spread across the country, in different venues, before different judges not bound by decisions of other judges. Defendants will make virtually identical motions to dismiss and will seek rulings in each venue, not only running the risk of inconsistent rulings, but also burdening scores of different district court judges.

Without a MDL, the various district courts will have to rule on identical foundational orders and discovery disputes, will then have to issue discovery and pretrial schedules on their respective case(s), often times which will conflict with other cases in other venues. The parties will then have to commence discovery, including corporate depositions, in what will inevitably be a first wave of filed cases, but this same discovery will not necessarily apply to other filed cases. Because future filed cases will likely have different and new attorneys in potentially new venues, discovery will not be able to be accomplished efficiently or effectively or even have a binding effect on new counsel and new plaintiffs; all of which a MDL court would be able to do. Informal coordination will be virtually impossible for these actions under the circumstances these cases present. *See In re Acetaminophen - Asd/Adhd Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 183759, *7.

As to duplicative discovery, such will undoubtedly take place here without a MDL as Defendants become faced with cases filed in waves over the next several months and years. Indeed, as different lawyers becomes involved and additional cases are filed, Defendants will have to produce documents at multiple times, subject to varying protective orders and ESI orders,

different privilege challenges (and standards), and their own witnesses will be subjected to multiple depositions by different lawyers. All of this will be a likely consequence without MDL centralization which is meant to prevent the unnecessary and inefficient waste of resources and duplicative discovery, especially through the implementation of foundational orders that bind future cases to the work-product conducted as part of the MDL pretrial proceedings.

Respectfully, your undersigned submits that it would be woefully inefficient to have informal coordination of these separate proceedings pending in different district courts, before different judges, and/or on different scheduling tracks in large part because of the number of cases at issue, estimated to grow exponentially, potentially to the thousands, and the naming of multiple defendants, which will lead to conflicting rulings and court orders. *See In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 183703, *5 (disagreeing that the parties could effectively informally coordinate the more than 20 actions that name multiple defendants); *In re Acetaminophen - Asd/Adhd Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 183759, *6 (noting that neither informal coordination nor Section 1404 would provide a practicable alternative given the number of involved actions, districts, parties, and counsel); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391 (J.P.M.L. Dec. 7, 2018)(same).

In arguing against a MDL and in favor of informal coordination, the L'Oreal Defendants rely heavily on *In re Belviq (Lorcaserin HCl) Prods. Liab. Litig.*, 555 F. Supp. 3d 1369 (J.P.M.L. Aug 10, 2021) but that case is readily distinguishable. First, in *Belviq*, the filed lawsuits had not meaningfully increased in the nearly 18 months since the FDA requested that the product be withdrawn from the market. In fact, when the MDL petition was filed 14 months after the drug's recall, there were only 13 actions filed and by the time the Panel issued its denial decision almost

18 months after the recall, the number of filed cases had only increased to just 20. Moreover, it was estimated that only a few hundred actions would be filed in total in that litigation. Here, by contrast, the NIH study was released just a few months ago on October 17, 2022, and your undersigned is aware of already at least 33 federal actions that have been filed. This does not include state court actions. Notably, this number has increased substantially from the day of the Movants' JPML filing, at which time there were approximately nine actions on file. Again, the parties anticipate that more actions will be filed in the coming months, and that the number of cases will grow exponentially, making this proposed MDL very different on that fact alone from the Belviq matter.

Second, in *Belviq*, there were a handful of plaintiff's counsel involved (approximately seven) with the majority of plaintiffs represented by the same firm. Here, there are currently 19 different plaintiffs' counsel with filed cases (not including local counsel) with no one firm having the overwhelming majority of the filed cases.

Third, *Belviq* involved only one drug and two manufacturers that had worked together to manufacture, market, and sell only that drug. And given the nature of the relationship of those defendants to Belviq, national counsel for each worked together as one to defend the claims against the plaintiffs, such as jointly filing one opposition to MDL centralization as opposed to separate ones. Here, by contrast, there are multiple defendants responsible for their own products who will be advancing their clients' own interests in defending and defending the claims asserted by plaintiffs.

While the L'Oreal Defendants claim that these actions can be informally coordinated without the need for a MDL, they fail to offer anything concrete as to how they intend to informally coordinate the 33 actions already on file, many of which are multi-defendant, multi-use cases, as

well as the additional cases to be filed in the future. Rather, they vaguely state, citing to *Belviq*, that they are "prepared to meet-and-confer regarding such alternatives such as cross-noticing depositions and sharing discovery as appropriate." *Def.* Loreal Br. at p. 14.

As counsel for the majority of the plaintiffs in the *Belviq* matter, your undersigned can attest to the many difficulties that arose out of the attempted "informal coordination" promised by the Belviq defendants. There was the growing likelihood for duplicative discovery, the reality of inconsistent rulings, and a waste of resources, particularly when the hypothetical posed by the Panel of defendants' fact witnesses being deposed multiple times became a reality as new law firms began to file cases. These difficulties will be even more staggering here given that we are dealing with multiple products and multiple, separate Defendants.[14]

In short, it would simply be inefficient, uneconomical, and likely impossible to engage in informal coordination of these separate proceedings that are pending in different district courts, before different judges, and/or on different scheduling tracks. *See In Re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346.[15] Defendants' efforts to delay this case and prevent efficient MDL coordination by utilizing the "oppose MDL treatment in lieu of informal coordination" strategy should be rejected. With 33 actions already filed by 19 law firms and with additional actions and new law firms filing cases rapidly, the impracticalities of informal coordination will continue to grow, discovery will not be able to be efficiently managed, and defense witnesses will end up being deposed multiple times as discovery requests continue to be made. Creation of a MDL would eliminate these impracticalities by allowing proceedings and discovery to take place in a

---

[14] In fact, in the *Proton-Pump Inhibitor MDL*, which also involves multiple defendants and multiple products, the defendants there initially argued against a MDL in favor of informal coordination and the Panel initially denied centralization. Yet, after realizing that informal coordination was simply not practical, when a second petition for centralization was filed, many of the PPI defendants changed their position and argued in favor of the MDL, which was then granted.

[15] *See also, In re Xarelto*, 65 F. Supp. 3d at 1404 *see also In re Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 3d 1378, 1379-1380 (J.P.M.L. 2015).

streamlined and coordinated fashion under the direction of a single MDL judge who in turn will likely appoint a plaintiff MDL leadership counsel to ensure the same. *See e.g.* Manual for Complex Litigation, Fourth Edition, 2004 ("Manual"), Sections 10.221 and 10.22.

**B.**   **THE MDL SHOULD BE SENT TO AN APPROPRIATE VENUE**

Plaintiffs herein submit that appropriate venues for this litigation include the United States District Courts for the Southern District of Ohio, the Eastern District of New York, the Northern District of Illinois or the Southern District of New York.

**1.**   **The Southern District of Ohio**

The Panel has previously identified advantages in transferring and consolidating cases before a district court in which at least one of the constituent actions is pending. *See e.g. In re Zimmer M/L Taper Hip Prosthesis and VerSys Femoral Head Prods. Liab. Litig*., 340 F.Supp.3d 1379, 1381 (J.P.M.L. 2018). Here, two cases that have been deemed related to each other are currently venued in the Southern District of Ohio[16] and this factor supports centralization there.

Additionally, the Southern District of Ohio is a geographically central location and easily accessible venue for parties and witnesses, which the Panel has held to be a significant factor weighting in favor of transfer, especially where there is no overwhelming nexus to any other forum. [17]   Indeed, on multiple occasions the Panel has found the Southern District of Ohio to be such a venue. *See e.g., In re: American Honda Motor Co., Inc., CR–V Vibration Mktg. and Sales Practices Litig*., MDL 2661, 140 F. Supp. 3d 1336, 1337 (J.P.M.L. 2015); *In re: E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig*., 939 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013)".

Moreover, Columbus, where both Chief Judge Algenon L. Marbley and Judge Michael H.

---

[16] The second filed action initially assigned to Judge Watson was recently deemed related to the first filed action assigned to Judge Newman.  As such, the second action was reassigned to Judge Newman.

[17] *See e.g. In re: EpiPen (Ephinephrine Injection USP) Marketing, Sales Practices & Antitrust Litig*., 268 F. Supp. 3d 1356, 1359 (J.P.M.L. 2017) (court transferred a nationwide litigation to a "geographically central forum").

Watson sit, is an easily accessible travel hub, convenient for all parties. Pertaining to travel to and from the courthouse, Port Columbus International Airport is only 8.3 miles away and, per Google maps, approximately 18 minutes from the courthouse, and a plethora of local hotels are within walking distance to the courthouse.

The Southern District of Ohio is a highly efficient locale for consolidated pretrial proceedings. According to judicial statistics, each Southern District of Ohio judge had only approximately 926 civil filings for the 12-month period ending on March 31, 2022. The average length of time from filing to disposition was a short 11.5 months.[18]

Further, the Southern District of Ohio is not overburdened and there are very few MDL's currently pending, which is another factor this Panel considers when deciding on an appropriate transferee venue. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F. Supp. 3d at 1396. As of December 15, 2022, only three MDLs were pending in the Southern District of Ohio, with two of them before an experienced MDL jurist, Judge Edmund A. Sargus, Jr. – *In Re: Davol, Inc//C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.* (MDL-2846) and *In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litig.* (MDL 2433). The latter MDL is practically finished with only two actions remaining.[19]

As to the appropriate jurist to oversee this MDL in this District, your undersigned respectfully suggests Chief Judge Algenon L. Marbley, Judge Michael H. Watson or Judge Michael J. Newman (although Judge Newman sits in the Dayton Division, as noted below).

First, Chief Judge Marbley has a reputation as a thoughtful, deliberate, and dedicated judge, and he unquestionably has the intellect and strong case-management skills that a MDL such as this

---

[18] https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0331.2022.pdf, p. 43 (last viewed January 11, 2023).
[19] https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-December-15-2022.pdf (last viewed January 11, 2023).

demands. He has over 20 years of experience as a judge and is well respected for his vast intelligence and skills. While he has never been assigned a MDL, Chief Judge Marbley has significant experience adjudicating large scale cases involving numerous plaintiffs, defendants, and a variety of complex claims. And even though Chief Judge Marbley is not currently overseeing a Hair Relaxer action, Plaintiffs respectfully submit that this factor should not be a deterrent as the Panel has, on multiple occasions, transferred a MDL to judges not assigned actions prior to the creation of the MDL. *See e.g. In re Aqueous Film-Forming Foams Prods. Liab. Litig.,* 357 F. Supp. 3d 1391, 1396; *In re Bard IVC Filters Prods. Liab. Litig.*, 122 F. Supp. 3d 1375, 1376-1377 (J.P.M.L. Aug. 17, 2015); *In re New Motor Vehicles Canadian Exp. Antitrust Litig., 269 F. Supp. 2d 1372,* (J.P.M.L. Aug. 17, 2015).

Second, Judge Watson, like Chief Judge Marbley, has significant judicial experience (over 25 years). Judge Watson was initially assigned to one of the Hair Relaxer actions, but it was reassigned to Judge Newman after being deemed "related" to a previously filed Hair Relaxer action already before Judge Newman. Judge Watson is currently assigned to a class action MDL – *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Practices Litig.,* MDL 3025. However, depending on his time and availability, he would likely make a terrific MDL jurist.

Lastly, Plaintiffs also support Judge Michael Newman for this MDL. While we are cognizant that he sits in Dayton, which is not as convenient a travel locale as Columbus, it is still not an "inconvenient" forum and still falls under the highly experienced Southern District of Ohio umbrella. Likewise, while he is newer to the federal bench as an Article III judge (having been appointed just over two years ago), Judge Newman has significant experience serving as a Magistrate Judge in the Southern District of Ohio for many years. As such, he too would be an appropriate jurist for this case.

## 2. The Eastern District of New York

There is presently one action pending in the Eastern District of New York[20] and this factor favors consolidation. *Supra*.

Additionally, the Eastern District of New York is an easily accessible and convenient location for all involved. See e.g., *In re Propecia (Finasteride) Prods. Liab. Litig.*, 2012 WL 1388896 (J.P.M.L 2012). New York is a central travel hub and, thus, it would not be unduly burdensome if the MDL was transferred there. This is especially true for Defendant L'Oreal USA, who is headquartered in New York. Indeed, Defendant L'Oreal USA supports the Southern District of New York; thus, taking a trip across the river to downtown Brooklyn should not be too objectionable.

The Eastern District of New York is an efficient locale for consolidated pretrial proceedings. According to judicial statistics, each Eastern District of New York judge had only approximately 489 civil filings for the 12-month period ending on March 31, 2022. The average length of time from filing to disposition was a short 6.9 months.[21] Notably, the United States District Court for the Eastern District of New York is not overburdened and there appear to be only three currently pending MDLs.[22]

As to an appropriate jurist to oversee the MDL, your undersigned respectfully suggests Judge Brian M. Cogan. Judge Cogan is a jurist who has significant MDL experience and the necessary knowledge and resources to successfully oversee a complex and likely large-scale MDL

---

[20] This case is pending before Judge Frederic Block. We surmise that Judge Block, who is based in the Long Island (Islip) division of the Eastern District of New York, likely does not want a new and large MDL.
[21] https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0331.2022.pdf, p. 10 (last viewed January 11, 2023).
[22] https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-December-15-2022.pdf (last viewed January 11, 2023). While the Panel's file identifies the *Propecia* MDL assigned to Judge Cogan as a currently pending fourth MDL, it then identifies there being "0" such actions pending now. This is consistent with the Panel's 2021 Order that no further actions be transferred to the *Propecia* MDL. Accordingly, Plaintiffs have not considered this an active MDL over which Judge Cogan is presiding.

as presented here. Examples of MDLs over which Judge Cogan has been lauded for his efficient case management are: *In re Air Crash Near Peixoto de Azeveda, Brazil,* (MDL-1844); *In re Bayer Corp. Combination Aspirin Prods. Marketing and Sales Practices Litig.* (MDL-2023); *In re Vitamin C Antitrust Litigation* (MDL-1738); and *In Re Propecia (Finasteride) Prods. Liab. Litig.* (MDL-2331), the last of which he inherited, and which resolved under his watch. Judge Cogan is not currently overseeing an active MDL and given his MDL history, he would be a well-suited selection for the Panel to consider.[23]

Currently, Judge Cogan is not overseeing a Hair Relaxer action; yet your undersigned respectfully submits that such should not be a deterrent in transferring this MDL to him given his exceptional experience in all litigation matters and his demonstrated ability and temperament to steer his past MDLs on a steady and expeditious course. *See e.g. In re Bridgestone/Firestone, Inc., ATX, ATX II, & Wilderness Tires Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 15926, *8 (J.P.M.L. Oct. 24, 2000).

### 3.  <u>The Northern District of Illinois</u>

Of the 33 filed actions, 13 of them are in the Northern District of Illinois. This factor lends support to this District as an appropriate MDL venue. See *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 787 F. Supp. 2d 1355 (J.P.M.L. 2011)(transferring to the District of New Jersey noting that nearly 2/3 of the pending actions were already); *see also In Re DePuy Orthopaedics, Inc.*, 753 F.Supp.2d 1378, 1380 (J.P.M.L. 2010).

Additionally, given the geographically central nature of the Northern District of Illinois, it would be an appropriate transferee venue for similar reasons identified above with respect to the Southern District of Ohio. In short, it is an easily accessible forum for parties and witnesses, and,

---

[23] *Id.*

thus, will serve the convenience of the parties and their witnesses, especially given that this MDL is a nationwide litigation with no one state having more contacts than others. The Panel has previously found the Northern District of Illinois to be "a convenient and accessible forum for actions filed throughout the country regarding products sold nationwide." *See e.g. In re Androgel Prods. Liab. Litig.*, 24 F. Supp. 3d at 1380.

Moreover, the Northern District of Illinois is an efficient locale for consolidated pretrial proceedings, despite the currently pending 14 MDLs.[24]

As to the appropriate jurist to oversee the MDL, your undersigned proposes Judge Rowland or Judge Kennelly, as advocated by the Movants.

First, Judge Rowland has two Hair Relaxer actions currently assigned to her, one of them being one of the first filed actions in the country. She served as a Magistrate Judge before being appointed to the bench in 2019 and in this capacity, she was assigned to *In re 100% Grated Parmesan Cheese Marketing and Sales Practices Litig.*, 201 F. Supp. 3d 1375 (J.P.M.L. 2016). While Judge Rowland has not presided directly over a MDL as an Article III judge, her reputation for intelligence, knowledge and ability supports that she would have the necessary skills to steer this MDL on its proper course.

Second, as to Judge Kennelly, it appears he currently has one Hair Relaxer action – the first filed one –assigned to him. Obviously, as a Panel judge his record and experience are well-known, including his past MDL experiences, which include the industry-wide testosterone replacement therapy MDL which involved multiple defendants.

---

[24] According to judicial statistics, each Northern District of Illinois judge had only approximately 332 civil filings for the 12-month period ending on March 31, 2022. The average length of time from filing to disposition was a short 7.4 months. https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0331.2022.pdf, p. 43 (last viewed January 11, 2023).

### 4. <u>The Southern District of New York</u>

There are two actions pending in the Southern District of New York. This factor favors consolidation there. For similar reasons with respect to the Eastern District of New York, Plaintiffs submit that the Southern District of New York is not unduly burdensome to access and is also a convenient venue for the parties and their witnesses. See e.g., *In re Ford Fusion*, 949 F. Supp. 2d 1368 (S.D.N.Y. Jun. 7, 2013). Admittedly, the Southern District of New York has a substantial number of MDLs before it – 15; its judicial statistics nevertheless support that it has the necessary capacity to handle this MDL.[25]

As to an appropriate jurist to oversee the MDL at the Southern District, your undersigned proposes Judge Edgardo Ramos. Judge Ramos has been assigned to your undersigned's case that is pending in the Southern District of New York, and, importantly, he is not currently assigned to any of the 15 MDLs pending in the Southern District of New York. Thus, to the extent the Eastern District of New York (Brooklyn) is not favorable, the Southern District is a second alternative to keep the cases in New York, with Judge Ramos as a terrific selection to manage this complex MDL.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff herein respectfully requests that the Panel grant the request for consolidation and centralization via a multidistrict litigation to the Southern District of Ohio, Eastern District of New York, Northern District of Illinois, or Southern District of New York.

---

[25] Particularly, each Southern District of New York judge had only approximately 409 civil filings for the 12-month period ending on March 31, 2022. The average length of time from filing to disposition was a short 5.8 months. https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0331.2022.pdf, p. 11 (last viewed January 11, 2023).

Dated: January 11, 2023

By: /s/ Michael A. London

Michael A. London, Esq.
DOUGLAS & LONDON, P.C.
59 Maiden Lane, 6th Floor
New York, New York 10038
Ph: (212) 566-7500
Fax: (212) 566-7501
*Attorneys for Plaintiffs*